ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JOSEPH TARTAKOVSKY (CABN 282223)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7320
    FAX: (415) 436-7234
    Joseph.tartakovsky@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:24-mj-71769 MAG |
| Plaintiff, | GOVERNMENT'S MOTION FOR DETENTION AND MEMORANDUM IN SUPPORT |
| v. | |
| CARLOS ALBERTO BAQUEDANO, ONESIMO DANILO CHOLULU GONZALEZ, | |
| Defendants. | |

The defendants here are charged with a drug trafficking offense involving a kilogram of fentanyl. The government respectfully urges the Court to detain Mr. Baquedano, as a danger to the community and a flight risk, and Mr. Gonzales, as a flight risk. The government has information to prove at trial that Baquedano is a San Francisco-based drug trafficker and money launderer of significance and has persisted in his misconduct despite an arrest for 20 pounds of methamphetamine just a few months ago. Mr. Gonzalez, meanwhile, lives outside the district, has no legal status in the country, no proposed sureties, no proposed custodians, and, in the Prebail Report, no proposed conditions of release.

## I.     LEGAL STANDARDS

This Court must detain a defendant before trial where "no condition or combination of conditions

will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1), (b). A finding that a defendant poses a danger to the community must be supported by clear and convincing evidence. *Id.* at (f)(2)(B). A finding that a defendant presents a risk of non-appearance must be supported by a preponderance of the evidence. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).

The Court considers four factors to determine whether pretrial detention is appropriate: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

Finally, the law presumes, subject to rebuttal by the defendant, that no condition or combination of conditions will reasonably assure the appearance of the defendant, and the safety of the community, when a defendant is charged with an offense under the Controlled Substances Act for which the maximum term of imprisonment is ten years or more. 18 U.S.C. § 3142(e)(3)(A).

## II.     ARGUMENT

**A.     It is defendants' burden to show that there are conditions of release that could safeguard the community and ensure their appearance.**

This Court must presume that no condition or combination of conditions will reasonably assure the defendants' required appearance and the safety of the community. *Id.* By signing the complaint and issuing arrest warrants, a magistrate judge found probable cause to believe that these defendants knowingly possessed with intent to distribute a controlled substance.[1] This offense carries a potential maximum prison term of 20 years.

**B.     The nature and circumstances of the charged offense, and the weight of the evidence, support detention.**

Fentanyl trafficking is among the most reprehensible offenses for the simple reason that no other drug causes so much devastation to this community. These defendants chose to profit from a deadly

---

[1] The criminal complaint identifies methamphetamine as the drug seized. That identification was based on a field test. The day after the seizure, lab testing established that the drug seized was in fact fentanyl. Defense counsel was informed of this fact at the first available opportunity.

supply chain that continues to pour fentanyl onto San Francisco's streets—and keep neighborhoods chaotic, users addicted, and morgues full. The weight of evidence is substantial: agents intercepted calls about a fentanyl deal to occur at specific time and place, arranged by individuals known to be involved in drug trafficking. Then two individuals—the known Baquedano and unknown Gonzalez—materialized at the precise time and place and exchanged a kilo of fentanyl. The kilo was seized.

### C.  Baquedano's history and characteristics, and the nature and seriousness of the danger to any person or the community posed by his release, support detention.

Baquedano is a particular threat to the community. He is a veteran and cautious player in the Tenderloin drug market. Investigators have long been aware of his misconduct, which has revolved around importation of drugs into the area and exfiltration of large sums of money out of it.

But more than that: on June 18, 2024, Baquedano was arrested by San Francisco police with *20 pounds* of methamphetamine that he had just picked up. (The calls leading to this June arrest were captured on a wire.) Baquedano might have taken this arrest as a glaring warning, as a chance to exit his perilous line of work. Instead he dropped the phone lines that he used in that criminal activity, acquired new ones, and got right back to it. In other words, Baquedano has demonstrated, just in the last few months, that he is willing to persist defiantly in criminality despite law enforcement action against him.

### D.  Baquedano is an extreme risk of flight or non-appearance

Because Baquedano has been targeted for wire interception, the government knows a considerable amount about the extent of his drug trafficking and money laundering misconduct. For purposes of establishing the risk that he would flee, the government observes the following.[2]

*First,* Baquedano is a Honduran national, not here lawfully, who was caught on a wire discussing his plans to sell his short-lived business—a food truck—and start fresh to Mexico. His discussions on this theme happened as recently as some three weeks ago.[3] Specifically, on November 21, 2024, Baquedano spoke to an associate in his drug-trafficking work. The associate asked if he, Baquedano, was planning on going to Mexico. Baquedano said he might, adding that he would willingly do so but

---

[2] On December 24, 2024, the Court granted the government's unopposed motion for an order waiving, for purposes of the detention hearing, the ten-day notice requirement of 18 U.S.C. § 2518(9) for intercepted wire communications. Therefore the contents of interceptions are used here.

[3] The summaries below are based on line sheets created by Spanish-speaking monitors. Defense counsel was emailed copies of the relevant line sheets and Spanish-language audio recordings.

for his children here. His friend observed that Baquedano's children might be able to come and go from Mexico. Baquedano then said that he was thinking of selling his food truck. (This truck is his only recent source of legitimate income, per both investigators and the Prebail Report.) Baquedano reflected on his intent to retire from his current illegal work and walk on the right path. His friend asked if the time was now. Baquedano said it was, given how great the risk was.

Baquedano evidently decided to move forward on relocation down south. On December 1, 2024, he spoke to another confidant. Baquedano said that he was committed to selling off his food truck and had received offers for it. He noted that he had already sold his chairs, refrigerator, van, and power-washing machine. The friend asked if Baquedano was planning on selling everything. Baquedano said yes, because "they" were calling him to come over there already, so he would soon leave for Culiacán (a city in the Mexican state of Sinaloa, known for cartel operations). The friend asked if Baquedano was leaving for good, given that he was selling everything. Baquedano said yes, and that he was just waiting to sell the food truck to leave, adding that he would depart as soon as he sold it. Baquedano said in effect that it was a pleasure to know him (his friend). The friend said, dang, all right then.

If Baquedano was pondering a move to Mexico *before* this federal charge, surely the calculus has now shifted immensely in favor of flight. Baquedano has not only stated, in confidence to a friend, that he plans on leaving, but indicated that he had was nearly done selling the property necessary to complete his exit and even named the town he plans to move to. The substance of these phone interceptions was indeed one reason that investigators decided to take Baquedano into custody when they did.

*Second*, Baquedano has not only the intent to leave the country, but access to the cash to do it. Agents believe that Baquedano moves money for cartels. Investigators have obtained records of transfers through accounts under his control. These show that an immense amount of "unexplained income" has passed through his hands. The government asserts that this money was the profit from drug trafficking in the Tenderloin and beyond. The chart below shows money movements in Baquedano's

accounts in 2023 and in the first six months of 2024:

|  |  | 2023 | 2024 |
|---|---|---|---|
| Cash Deposits: |  | $ 283,677.00 | $ 99,674.00 |
| Check Deposits |  | $ 33,450.00 | $ 18,276.00 |
| Zelle Transfers IN |  | $ 89,993.00 | $ 40,181.00 |
|  |  | $407,120.00 | $158,131.00 |
| Cash Withdrawals |  | $ 13,014.00 | $ 11,817.00 |
|  | Net | $ 394,106.00 | $ 146,314.00 |
|  | W2's | $ 48,000.00 |  |
|  | Unexplained Income | $346,106.00 |  |

Yet Baquedano claimed *no* income to the Pretrial Officer, despite stating that he had $3,800 in monthly expenses. Jazmin Ortega, his wife, said that Baquedano must pay, each month, $2,300 in rent, $615 in utilities, and $500-600 in groceries. The existence of these financial obligations is hard to square with his representation that (1) he has zero income and (2) has been unemployed for two months.

The facts establish by a preponderance that he is a flight risk and indeed an extreme risk. The defense cannot overcome the presumption against him.

**E.      Baquedano's wife, Jazmin Ortega, cannot be a surety or custodian.**

The Prebail Report says that Baquedano's wife, Jazmin Ortega, has offered herself as a surety or custodian. She cannot serve in these roles because she is fully aware if not implicated in her husband's alleged criminality. This memorandum is not the place to elaborate but for purposes of this hearing: (1) Ortega has been captured on recordings speaking with Baquedano about transfers of money from suspected drug trafficking; (2) the government has information that she assisted in other ways in his criminal work; (3) she was in the car when Baquedano picked up the kilogram of fentanyl last week; and (4) she was in the car when Baquedano picked up the 20 pounds of methamphetamine that led to his June arrest and in fact an agent declared under oath that he saw Ortega, during the traffic stop, try to sneak the backpack containing the methamphetamine out of the car to prevent police from finding it. In short, there are unavoidable inferences that Ortega knows her husband's methods of money-making and that any bond she might have to pay would likely be tainted by illicit proceeds. The government notes, too, that she claimed to the Pretrial Officer that she has no income whatsoever and no existing assets.

Ms. Ortega has familial and financial incentives to help Baquedano flee or to flee with him. She

also has incentives—that one imagines would be insuperable—to avoid being truthful with Pretrial officers, such as with respect to an obligation to report her own husband for any violations.

**F.      The government has concerns about Jessica Ortega as a surety or custodian**

Jazmin's sister, Jessica Ortega, is also offered as a surety or custodian.  But bank information in the government's possession shows money transfers from Jessica Ortega that are at a minimum consistent with remittances to foreign countries for drug-sale proceeds.  More to the point, these transfers are consistent with specific method of money movement that the government believes Mr. Baquedano specialized in.  For instance, since 2020, there have been numerous wire transfers sent out under Ms. Ortega's name—$82,601 to Guatemala and $8,500 to Mexico, $7,500 of which went to recipients in Sinaloa.  These transfers are in tension with her claim today of a $50,400 annual salary.  Jessica Ortega also received $26,500 in wires to her bank account sent from El Salvador.

**G.      The Prebail Report for Mr. Gonzalez, and the information possessed by the government, are too sparse to justify pretrial release and overcome the presumption.**

The information before the Court about Mr. Gonzalez does not, without more, support release. He faces a presumption in favor of custody.  The Prebail Report writes that although Mr. Gonzalez's background information is "unverified," and despite the fact that no "release address or bail resources" have been identified, he nevertheless "appears on the surface to be an appropriate candidate for release." The report indicates that there "may be" conditions that can be imposed, but the report proposes none. The government notes that Mr. Gonzalez resides out of district—in Taft, California, near Bakersfield. He is a citizen of Mexico and subject to removal proceedings.  Mr. Gonzalez is essentially unknown to investigators, except that he was evidently trusted enough to transport a kilogram of fentanyl.

### III.      <u>CONCLUSION</u>

The government respectfully requests that the Court detain Mr. Baquedano as a danger to the community and a flight risk.  The government requests that the Court detain Mr. Gonzalez as a flight risk.

DATED:   December 24, 2024                         Respectfully submitted,

                                                                          ISMAIL J. RAMSEY
                                                                          United States Attorney

_____/s/_____
JOSEPH TARTAKOVSKY
Assistant United States Attorney